UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSHUA W. ROWE,

                Plaintiff,

      v.                            Case No. 15-C-1006

JODY DEROSA, et al.,

                Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Joshua Rowe, proceeding *pro se*, filed this action under 42 U.S.C. § 1983, alleging that his civil rights were violated. He claims that the defendants violated his constitutional rights through deliberate indifference to his medical and mental health needs. Originally assigned to Judge Clevert, the case was reassigned to me on March 15, 2017. Currently before the court is defendants' motion for summary judgment. The motion is fully briefed and ripe for disposition. For the following reasons, the defendants' motion will be granted and the case will be dismissed.

## I. BACKGROUND

Rowe's claims arise out of the relatively brief period of time during which he was housed at Dodge Correctional Institution between July 25, 2014, when he arrived, and October 4, 2014, when he was transferred to Waupun Correctional Institution. DCI is the central reception center for all adult male inmates sentenced to prison in Wisconsin. Dodge Correctional Institution, Wisconsin Department of Corrections, https://doc.wi.gov/Pages/OffenderInformation/AdultInstitutions/

DodgeCorrectionalInstitution.aspx (last visited Jan. 19, 2018). Upon arrival at DCI, inmates undergo a comprehensive assessment and evaluation with the goal of determining program needs, custody level and institution placement. *Id.* It was during this evaluaton and assessment process that Rowe claims his constitutional rights were violated.

In essence, Rowe claims that the defendants were deliberately indifferent to his serious mental health needs. He claims that the prescriptions for the medications he was taking for his post traumatic stress disorder, Trazadone and Prazosin, were allowed to run out, and on August 28, 2014, he did not receive his medication. The failure to provide him his medication, he contends, led to his being involved in an altercation with another inmate on August 30, 2014. He was then placed in segregation without a proper investigation of the psychological causes of the incident, and while in segregation, denied proper mental health treatment. Lastly, he alleged that he received a maximum security placement because of this fight, which also violated his constitutional rights. *Id.* The facts established by the undisputed evidence relating to each allegation and each of the defendants will be set forth in detail.

**A. The Events of August 28, 2014 and the Subsequent Days**

On Thursday, August 28, 2014, Defendant Carolyn Lewis, a DCI correctional officer, was handing out medication during the evening medication pass in Rowe's unit. Defendants' Proposed Findings of Fact ("DPFOF"), ECF No. 65 at ¶¶ 2, 20. The evening medication pass usually occurs between 8 and 9 pm. *Id*. at ¶ 20. While Lewis was handing out medication, Rowe approached and asked for his evening dose of Trazadone and Prazosin. *Id*. at ¶¶ 21–22. He was taking these pills for post-traumatic stress disorder. Plaintiff's Proposed Findings of Fact ("PPFOF"), ECF No. 75 at ¶ 10. Lewis informed Rowe that his medication was out. DPFOF ¶ at 25. It was Rowe's

2

responsibility, as described in the inmate handbook, to fill out a medication request for a prescription refill when he was low.[1] *Id*. at ¶ 23; ECF No. 56-1 at 8.

Rowe became upset, so Lewis contacted Sergeant Krueger, who was working on another unit at the time, and he came to Rowe's cell to speak with him. *Id*. at ¶¶ 26–27. Sergeant Krueger then spoke with the Health Services Unit ("HSU") to see if they could get Rowe's medication that night.[2] *Id*. at ¶ 28. HSU told Sergeant Krueger that the medication would be delivered the next day, Friday, August 29, 2014. *Id*. at ¶ 29. Sergeant Krueger also attempted to contact the Psychological Services Unit ("PSU"), in order to make sure they were aware that Rowe was out of his medication. *Id*. at ¶ 30. Sergeant Krueger was told that there was no one from PSU at the institution because

---

[1] Rowe disputes this allegation by stating that "It is the duty of the officers to order medication when it is 7 days before the medication runs out." ECF No. 74 at 4. However, Rowe failed to provide any evidentiary material to support this proposition. Rather, his only support is his own allegation that it was the guards' responsibility. Defendants supported their assertion with a copy of the inmate handbook which explains that it was Rowe's responsibility to refill the prescription. ECF No. 51-1 at 29. Because Rowe has failed to provide any evidentiary support, the court finds undisputed the fact that it was Rowe's responsibility to submit a request to have his prescription refilled. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("As we have emphasized, 'when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts' . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

[2] Rowe attempts to dispute some of the defendants' proposed facts by stating that he "denies" the fact. However, the court notes that each of the facts Rowe challenges are supported by evidence in the record, more specifically, declarations of the defendants indicating their personal knowledge, as well as other supporting documentation. For these denials, Rowe offered no sworn testimony or other evidentiary material setting forth contrary facts. In order to dispute a material fact, Rowe must do more than raise mere "metaphysical doubt as to the material facts." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). Therefore, for the facts that Rowe merely "denies" without citation to any evidentiary support in the record, the court deems the facts undisputed. Fed. R. Civ. P. 56(e)(2). This applies to Defendant's Proposed Findings of Fact ¶¶ 29, 32–35, 38, 44–47, 53–54, 56, 58, 63, 64, 76, 82, 85, 94, 99, 105–11, 114–17, 122, 130–34, 141, 143, 145, 157, 168–71, 174–75, 180–81. The disputed facts that Rowe properly supports are noted.

it was after hours.  *Id*.  Sergeant Krueger told Rowe to fill out a psychological services request form to cover all available options to him that evening.  *Id*. at ¶ 35.  Rowe received his Trazadone and Prazosin the next day, August 29, 2014.[3]  *Id*. at ¶ 40; *see also* ECF No. 67-1 at 76.

On August 30, 2014, at 3:30 pm, Defendant Gunderson, a correctional officer, heard a scuffle by the stairwell as inmates returned to their cells.  *Id*. at ¶¶ 2, 42.  There, Gunderson observed Rowe and another inmate wrestling on the floor with blood on their hands and on the floor.  *Id*. at ¶ 42.  Gunderson issued both Rowe and the other inmate a conduct report for fighting.  *Id*. at ¶ 43.  Rowe never told Gunderson a reason why he was fighting.  *Id*. at ¶¶ 44–45.  Rowe did not tell Gunderson that he had missed his medication two days prior nor did he allege that he had been denied or was being denied mental health treatment.  *Id*. at ¶ 45.  Nor was there anything about the incident that concerned Gunderson or caused him to conclude that Rowe had missed his medication or mental health treatment.  *Id*. at ¶ 46.  After writing the conduct report, Gunderson did not have any involvement in the decision to place Rowe in disciplinary separation or temporary administrative segregation.  *Id*. at ¶ 47.

Lieutenant Davis Arndt placed Rowe in temporary administrative segregation after the fight pending the outcome of Rowe's conduct report.  *Id*. at ¶¶ 4, 48.  Rowe was placed in temporary administrative segregation because inmates who engage in physical altercations present a threat to the safety and security of the institution, other inmates, and staff members.  *Id*. at ¶ 48.  Rowe was

---

[3] Rowe disputes this fact by submitting a declaration that states that he "did not receive them until after the fight on August 30th, 2014." ECF No. 76.  Defendants provided Rowe's medical records which clearly show that Rowe received his medication on August 29th.  Rowe cannot create a "genuine" dispute over when he received his medication again by simply denying he got it without evidentiary support when his medical records contradict his allegation and clearly indicate that he received his medication. *See* Fed. R. Civ. P. 56(c); s*ee also Scott*, 550 U.S. at 380.  Therefore, the court finds undisputed that Rowe received his medication again on August 29th, 2014.

placed there pending the outcome of his conduct report for fighting. *Id*. at ¶ 52. Rowe made no comments to Lieutenant Arndt regarding his placement in temporary administrative segregation or running out of his medications. *Id*. at ¶¶ 53–54. Arndt did not have any involvement in placing Rowe in disciplinary segregation, which happened after he was found guilty of his conduct report. *Id*. at ¶ 49.

On September 2, 2014, Captain Janel Nickel reviewed the conduct report and determined that it should proceed to a disciplinary hearing as a major offense. *Id*. at ¶¶ 5, 55. Nickel's job was not to determine guilt or innocence, but to review the appropriateness of the charge. *Id*. at ¶ 56. The conduct report did not mention anything about Rowe missing his medications or mental health treatment. *Id*. at ¶ 57. Nickel did not discuss the conduct report with Rowe. *Id*.

On September 4, 2014, Lieutenant Thomas Mariani presided over Rowe's disciplinary hearing. *Id*. at ¶¶ 4, 59–60. At the disciplinary hearing, Rowe admitted that he was guilty of fighting. *Id*. at ¶ 61. Rowe stated that the other inmate had been giving him a hard time and calling him a child molester, so Rowe swung at him several times. *Id*. at ¶ 62. Rowe stated that he was having "issues" with his medication at the time, but he did not attribute his conduct to any problems with medication. *Id*. at ¶ 63. Based on the conduct report, photos of the incident, and Rowe's admission of guilt, Lieutenant Mariani determined that it was more likely than not that Rowe had violated prison rules and sentenced him to thirty days of disciplinary segregation. *Id*. at ¶¶ 65, 66. Rowe was moved from temporary administrative segregation to disciplinary segregation on September 4, 2014. *Id*. at ¶ 67.

On September 10, 2014, Dr. Dawn Landers, a licensed psychologist at DCI, performed a psychology staff evaluation on Rowe. *Id*. at ¶¶ 7, 68. Dr. Landers noted that based on her meetings

with Rowe on September 3rd and 10th, he demonstrated an adequate psychological adjustment to disciplinary segregation. *Id*. at ¶¶ 69–70. Dr. Landers recommended that Rowe be released from disciplinary segregation on September 19, 2014, after having served half of his thirty day sentence. *Id*. at ¶ 71. Captain Scot Galligan, program captain of the restrictive housing unit, and Captain Nickel also recommended that Rowe be released on September 19, 2014. *Id*. at ¶¶ 6, 72. Deputy Warden Schneiter ultimately ordered that Rowe be released on September 17, 2014 because he had conducted himself in an appropriate manner while housed in disciplinary segregation and had served adequate time. *Id*. at ¶¶ 8, 73–74. Galligan, Nickel, and Schneiter all reviewed Dr. Landers' note that Rowe demonstrated adequate psychological adjustment to his disciplinary segregation before making their recommendations. *Id*. at ¶ 75. Galligan's and Schneiter's recommendations for release were the only interactions they had with Rowe. *Id*. at ¶ 72. Rowe spent a total of thirteen days in disciplinary segregation after his four days in temporary administrative segregation. *Id*. at ¶ 77.

**B. Rowe's Mental Health Services at DCI**

On July 28, 2014, Dr. Landers had her first appointment with Rowe after he was transferred to DCI. *Id*. at ¶ 78. She conducted a mental health screening interview, which inquired about Rowe's mental health history and current mental health status. *Id*. at ¶ 79. At the time, Rowe denied any psychological distress but said that he had a prescription for psychotropic medications to treat symptoms of post-traumatic stress disorder and depression, which included nightmares. *Id*. at ¶ 80. After conducting her assessment, Dr. Landers classified Rowe as an MH-1, which indicates that he had a mental health need but was not experiencing clinically significant symptoms. *Id*. at ¶ 81. When Rowe was taking his medication, he was reasonably emotionally stable. *Id*. at ¶ 83. Dr. Landers recommended that Rowe be seen every six months for follow up and evaluation. *Id*. At that

time, Dr. Landers had no special placement concerns about Rowe because he presented as psychologically stable overall with minimal active mental health symptoms. *Id*. at ¶ 84. Additionally, Rowe did not present with any serious mental illness concerns that would be considered to be a risk to himself or to other inmates. *Id*. at ¶ 85.

On August 30, 2014, two days after the missed medication, Defendant Kathy Hielsberg, a licensed nurse at DCI, was forwarded a psychological service request from HSU. *Id*. at ¶ 86. This request from Rowe was dated August 28, 2014. *Id*. at ¶ 87. The request indicated that Rowe wanted to be seen by the psychology staff and that he was not given his medication on August 28, 2014. *Id*. at ¶ 88. The request was forwarded to HSU because PSU does not refill prescriptions. *Id*. at ¶ 89. Hielsberg's supervisor, a registered nurse, forwarded the psychological service request to Hielsberg and instructed her to call the unit to see if they got the Trazodone on August 29th. *Id*. at ¶ 90. Hielsberg called the unit and was told that the Trazadone had been sent to Rowe's unit on August 29, 2014. *Id*. at ¶ 92. Hielsberg then returned Rowe's psychological services request to him with the response that "Trazadone was sent to your unit 8/29/2014. The officer gives you these meds." *Id*. at ¶ 93. Hielsberg's only responsibility was to confirm whether Rowe had received his Trazadone on August 29, 2014. *Id*. at ¶ 91. Hielsberg had no authority to schedule an appointment for Rowe with Psychological Services, which must be made either by PSU or by her supervisor. *Id*. at ¶¶ 94–95. Hielsberg had no other contact with Rowe during his incarceration. *Id*. at ¶ 96.

Dr. Landers had her second interaction with Rowe on Wednesday, September 3, 2014, while conducting routine PSU rounds in the restrictive housing unit, where Rowe was being kept during his temporary administrative segregation. *Id*. at ¶¶ 97–98. Rowe did not request a follow up psychological request or any other psychological service between his initial meeting with Dr. Landers

and her second visit. *Id*. at ¶ 99. During her visit with him, Rowe informed Dr. Landers that he was there because of a physical altercation with another inmate. *Id*. at ¶ 101. Dr. Landers was unaware of the altercation when she met with Rowe but confirmed the physical altercation with a security staff member after her appointment with him. *Id*. at ¶ 100.

At the September 3rd meeting, Dr. Landers and Rowe discussed Rowe's history of anger and aggression. *Id*. at ¶ 102. Rowe blamed his fight and administrative segregation on having missed his sleep medication a few days prior. *Id*. Dr. Landers reviewed Rowe's medical logs, which indicated his receipt of his medication on August 29th, and determined that Rowe was attempting to avoid acceptance of responsibility for his maladaptive actions by blaming it on the missed medication. *Id*. at ¶¶ 103–05. Dr. Landers stated that it was inappropriate for him to blame his behaviors on poor sleep and irritability caused by missing one dose of medication. *Id*. at ¶ 106. Dr. Landers believed in her professional opinion that Rowe's excuse was unreasonable and baseless because there was no evidence of serious mental health concerns that would result in an impairment of judgment, decision making, general cognition, or understanding of adaptive and expected appropriate behaviors. *Id*. at ¶ 109. For this reason, Dr. Landers determined that Rowe's placement in segregation was a reasonable and appropriate consequence for his behaviors and that it was not damaging to his present or ongoing functioning or well being. *Id*. at ¶ 110.

On September 10, 2014, Dr. Landers had her next and final appointment with Rowe. *Id*. at ¶ 112. Rowe presented as alert and oriented; did not relay any complaints; did not present as delusional or experiencing serious mental illness; did not report any ongoing psychotropic medication concerns; and did not report any adverse behavioral or cognitive impacts because of his placement in disciplinary segregation. *Id*. at ¶ 116. Dr. Landers noted that Rowe's reports and presentation

of psychological functioning were indicative of generally adequate psychological adjustment to disciplinary separation. *Id*. at ¶ 117. Therefore, Dr. Landers determined there was no psychological contraindication to Rowe's continued placement in disciplinary segregation. *Id*. at ¶ 118. In total, Rowe spent seventeen days in segregation (combined administrative and disciplinary) and Landers had two appointments with Rowe during those days. *Id*. at ¶ 119. After September 10, 2014, Landers did not have any additional interactions with Rowe nor did she receive any requests from Rowe for an appointment. *Id*. at ¶ 121.

On September 12, 2014, Dr. John Wean, a psychiatrist at DCI, had his only appointment with Rowe. *Id*. at ¶¶ 123, 125. The purpose of Dr. Wean's visit was to conduct a full psychiatric assessment, including the history of Rowe's present illness, psychiatric history, medical history, substance abuse history, family history, and social history. *Id*. at ¶¶ 126–27. Dr. Wean noted the medication that Rowe was currently on. *Id*. at ¶ 128. Dr. Wean also noted that during the examination Rowe was alert, oriented, and reasonably well groomed and cooperative, but somewhat rambling and circumstantial in his presentation. *Id*. at ¶ 129. Dr. Wean noted the Rowe exhibited no abnormal psychomotor movements and did not witness any psychotic process. *Id*. at ¶ 130. Dr. Wean noted that Rowe's voice was of normal tone, rate, and volume and that his speech was relevant and coherent. *Id*. Dr. Wean also noted that Rowe did not have any thoughts of hurting himself or others and that Rowe's affect was minimally dysphoric but appropriate. *Id*. at ¶ 131.

Overall, Dr. Wean noted that Rowe's mental status examination was unremarkable and in Dr. Wean's professional opinion, Rowe showed an absence of distress at being in disciplinary segregation and showed no pressing need to be moved out of disciplinary segregation. *Id*. at ¶¶ 133–34. Dr. Wean diagnosed Rowe with unspecific depressive disorder with PTSD-like

symptomology, anti-social personality traits, a history of marijuana and alcohol abuse, and uncreative colitis. *Id*. at ¶ 136. Dr. Wean adjusted Rowe's medication slightly and recommended a follow up appointment in three weeks or sooner if necessary. *Id*. at ¶¶ 137–38. During the time between Dr. Wean's appointment and Rowe's transfer out of DCI, Rowe did not contact Dr. Wean about a follow up appointment. *Id*. at ¶ 139.

Additionally, outside of Rowe's interactions with Landers and Dr. Wean, he did not request an appointment or help from the Psychological Services Unit after being placed in administrative or disciplinary segregation. *Id*. at ¶ 122.

## C. Rowe's Inmate Complaint

On September 2, 2014, Rowe filed an offender complaint alleging that he ran out of his medication and needed it reordered. *Id*. at ¶ 140; *see also* ECF No. 56-1 at 1. In his offender complaint, he did not allege a denial of mental health treatment or that he became violent because of his denied medication. *Id*. at ¶ 141. Nor did he allege that he was placed in disciplinary segregation as a result of being denied his medication. *Id*. at ¶ 142.

Defendant Michael Patten, the Institution Complaint Examiner, reviewed the complaint and noted that medicine had been reordered and that Rowe had his medication at that time. *Id*. at ¶¶ 11, 143. With the problem solved, Patten recommended that the complaint be dismissed. *Id*. at ¶ 144. Patten contacted Lewis, and no one else, for information about Rowe's offender complaint. *Id*. at ¶ 145.

On September 3, 2014, Defendant Jody DeRosa, the Health Services Nursing Coordinator, accepted Patten's recommendation and dismissed the offender complaint. *Id*. at ¶¶ 12, 146. In dismissing the complaint, DeRosa included a portion of the Inmate Handbook, which Rowe received

upon arrival at DCI, that explains the process for inmates to refill their medication. *Id*. at ¶¶ 146–47; *see also* ECF No. 56-1 at 3. DeRosa noted that refilling medications is the responsibility of the inmate. *Id*.; *see also* ECF No. 56-1 at 3. On the same day, Defendant Beth Dittman, the Nursing Supervisor, received copy of the decision, noted the dismissal, and took no further action. *Id*. at ¶ 148.

On September 15, 2014, Rowe appealed this decision to the corrections complaint examiner's officer. *Id*. at ¶ 149. On appeal, for the first time, Rowe alleged that he was denied mental health treatment and that the fight could have been avoided if there was a way for him to get psychological help in time. *Id*. at ¶ 150. However, inmates may not raise a new issue upon review to the corrections complaint examiner; rather, all issues must first be raised to the inmate complaint examiner. *Id*. at ¶ 152. Because Rowe did not raise this issue with the inmate complaint examiner, the corrections complaint examiner could not review it. Instead, he was limited to reviewing whether Rowe's prescription was refilled. *Id*. at ¶ 153. Charles Facktor, the Corrections Complaint Examiner, noted that the complaint had been reviewed and that Rowe provided no new information on appeal that warranted overturning the decision. *Id*. at ¶ 154. Facktor recommended that the complaint be dismissed. *Id*. at ¶ 155. Defendant Cindy O'Donnell was the Policy Initiatives Advisor and was the Secretary's Designee for making final agency decisions under the Inmate Complaint Review System. *Id*. at ¶ 14. O'Donnell accepted Facktor's recommendation and dismissed the complaint. *Id*. at ¶ 156. O'Donnell did not consider Rowe's new allegations of denial of mental health treatment because it was raised for the first time on appeal. *Id*. at ¶ 157.

### D. Rowe's Inmate Security Classification

On September 17, 2014, Defendant Anna Neal, the Offender Classification Specialist, met with Rowe for an initial classification to address Rowe's custody, site placement, and program assignment. *Id*. at ¶¶ 16, 159. Neal reviewed Rowe's incarceration history, offenses, offense dynamics, offense history, sentence structure, institutional behavior, institutional conduct, institutional adjustment, medical needs, dental needs, mental health needs, risk rating, and program needs. *Id*. at ¶ 162. Neal found that Rowe had recently been found guilty of fighting and received thirty days of disciplinary segregation. *Id*. at ¶ 163. Rowe reported that the night of the fight he had been denied his medication, which threw his sleeping patterns off and that he knew he was going to be a danger. *Id*. at ¶164. Rowe also stated that he attempted to get help prior to this occurring. *Id*. Neal noted Rowe's version of the events. *Id*. at ¶ 165.

Neal recommended that Rowe be placed in maximum security because he had violated his supervision rules in the community by viewing multiple digital images of child pornography on his laptop, because he had thirteen counts of possession of child pornography pending, and because of his previous incarceration conduct history, current history of fighting, and history of assaultive offenses. *Id*. The maximum sentence for each of his possession of child pornography charges was fifteen years; therefore, his charges had the potential for further incarceration, which made him a high risk on the classification risk scale for temporary factors. *Id*. at ¶¶ 166–67. Additionally, Rowe was considered high risk due because his offense history was lengthy and serious in nature, and due to his assaultive past, which included previous weapons offenses and a conviction for Battery to Law Officers/Firefighters. *Id*. at ¶ 168. Neal explained that the dynamics of Rowe's current offense and pending charges, his motivation and attitude regarding his offense and violation, and his prior

criminal history were all factors in her decision making process. *Id*. at ¶ 169. Neal also explained that the conduct report for fighting further justified the decision to place him in maximum security but that it was not the deciding factor. *Id*. at ¶ 170. Neal recommended placement at a maximum security institution and a sixth month recall, so that Rowe's custody could be reviewed. *Id*. at ¶ 171; ECF No. 65; ECF No. 57-1.

Gary Kumber, the Senior Offender Classification Specialist, reviewed Neal's security recommendation for approval. DPFOF at ¶ 17, 173. Kumber reviewed the same risk factors Neal had reviewed. *Id*. at ¶ 173. Kumber's role was not to make new findings in the matter but to review Neal's decision to make sure there were no mistakes and the placement was supported by documentation. *Id*. at ¶¶ 174–75. Kumber noted that the documentation supported Neal's recommendation because of Rowe's poor conduct and the seriousness of his pending charges for possession of child pornography. *Id*. at ¶ 176.

On September 18, 2014, Rowe submitted an Administrative Review of Initial Classification or Re-Classification Decision. *Id*. at ¶ 177. Rowe stated:

> The custody level proposed by Anna Neal, and imposed by G. Kumber, is dramatically unnecessary. According to the classification report, Kumber cites "poor conduct, serious charges" as justification for the decision of maximum custody. These are erroneously used for these reasons: one—a cursory examination of complaint DCI-2014-17116 will prove I had informed P.S.U. that, as a result of medicine denial, I was feeling my "anger rise to dangerous levels." As I was not seen or helped by DCI, using a resulting conduct report to predicate max custody is inhumane, and violation of due process. Two: My pending charges are in such an early stage of adjudication, a reliable decision cannot be made from them.

*Id*. at ¶; ECF No. 59-1. John Bett, the Inmate Appeal Examiner, reviewed the record and rejected Rowe's request on October 9, 2014. DPFOF at ¶ 18, 179. Bett noted that there was no factual error that led to the classification. *Id*. at ¶¶ 179–80. Bett made no new findings of fact. *Id*. at ¶ 180.

13

**E. Federal Complaint**

On August 20, 2015, Rowe filed a *pro se* 37-page complaint pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights had been violated by 50 individual defendants. ECF No. 1. That complaint was stricken at the screening stage for improper joining of unrelated claims, *see George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007), but Rowe was given leave to file an amended complaint, which he did on May 12, 2016. ECF Nos. 15, 18. In his amended complaint, Rowe alleged that more than twenty defendants were deliberately indifferent to his medical needs by failing to provide his mental health medication, which caused him to assault another inmate two days later and resulted in his placement in disciplinary segregation. ECF No. 18 at 3. After screening, he was allowed to proceed against nineteen defendants on his claims. He first claims that the defendants were deliberately indifferent to his medical needs by failing to provide his mental health medication, which caused him to assault another inmate two days later. ECF No. 18 at 3. Rowe further alleges that the defendants violated his constitutional rights by placing him in disciplinary segregation without investigating the incident. *Id*. at 4. Additionally, he alleged that they were deliberately indifferent in providing mental health treatment while he was in segregation. *Id*. at 5. Lastly, he alleged that he received a maximum security assignment because of this fight, which also violated his constitutional rights. *Id*.

Defendants moved for summary judgment. ECF No. 45. They allege that Rowe's deliberate indifference claims fail as a matter of law and that there was no deliberate indifference by any actor. ECF No. 64 at 24–44. They also allege that Neal, Kumber, and Bett have absolute immunity for their recommendation that Rowe be assigned to a maximum security facility. *Id*. at 44–46.

Alternatively, defendants allege that they are all entitled to qualified immunity. *Id*. at 46–51. The matter has been fully briefed and is ripe for decision.

## II. LEGAL STANDARD

Under the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

"At the summary judgment stage, the facts must be viewed in the light most favorable to the nonmoving party only if there is "genuine" dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). However, "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record is taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Therefore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so

that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

### III. ANALYSIS

Rowe's claims of deliberate indifference fail as a matter of law. In essence, Rowe argues that he should not be responsible for any of the consequences that befell him after he instigated a fight with another inmate. Rowe believes he should not be responsible because he missed his medication two days prior to the fight. Rowe then argues that over a dozen correctional staff members were deliberately indifferent to his mental health needs because they imposed, or were part of the process that imposed, consequences for his actions. A claim of deliberate indifference is not a "get out of jail free" card for inappropriate behavior and Rowe's claims of deliberate indifference fail as a matter of law on the undisputed facts before the court.

In order to succeed on a claim of deliberate indifference Rowe must show two elements: (1) that he suffers from an objectively serious medical condition; and (2) that the state official was subjectively deliberately indifferent to that objectively serious medical condition. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Defendants have conceded, for purposes of their summary judgment motion only, that Rowe had an objectively serious medical condition. However, Rowe must still show that each state official was subjectively deliberately indifferent to that serious medical condition. Stated another way, Rowe must show that each "defendant had actual knowledge of impending harm which he consciously refused to prevent." *Hill v. Shobe*, 93 F.3d 418, 421 (7th Cir. 1996). Furthermore, deliberate indifference is a high standard. Ordinary negligence, or even gross negligence, are not sufficient to establish deliberate indifference. *McGill v. Duckworth*, 944 F.2d 344, 348 (7th Cir. 1991).

## A) Defendants Lewis and Krueger

Rowe's claims against Lewis and Krueger fail as a matter of law because neither of them denied him his evening medications, nor were they deliberately indifferent to his medical needs. Rowe was responsible for refilling his prescriptions; he cannot blame his failure to do so on Lewis and Krueger.[4] Furthermore, because it was after 8 pm, Lewis and Krueger were unable to secure medication for him. The fact that they tried to do so, however, shows that Lewis and Krueger were responsive—not indifferent—to Rowe's pleas for his medication. Lewis double-checked the medication cabinet. Krueger called HSU and PSU and encouraged Rowe to submit an Psychological Services Request form to cover all of his available options and ensure he got his medication. Lewis and Krueger's active attempts to procure Rowe's medication are the antithesis of deliberate indifference.

Rowe also argues that the defendants were deliberately indifferent in failing to place him in segregation to prevent him from harming others. Rowe asserts that he warned them that he would be a danger to himself and others without his medication. Lewis and Krueger dispute this allegation, but the dispute is immaterial because Rowe did not become violent on the night of the same night he did not take his medication. Rowe instigated a fight with another inmate on August 30th, two days later and after he had received his medication on August 29th. Even if the court construes the facts in favor of Rowe and finds that Rowe warned them that he would be dangerous on the night

---

[4] Even if it had been the guards' responsibility to reorder prescriptions and not Rowe's, Rowe's claims would still fail because there is no evidence that Lewis or Krueger were the guards responsible for refilling the prescription to ensure that Rowe did not run out. There is no indication the either Lewis or Krueger were aware that Rowe may run out of medication before that night. At best, Rowe's argument is that some unknown guard was responsible for refilling his prescriptions and did not.

of August 28th, Rowe still fails to show subjective knowledge because Rowe did not harm himself or anyone else on the night of August 28th. He did not harm himself or anyone on August 29th. Rather, Rowe instigated a fight on August 30th, after having received his medication the night before. Even finding the Rowe warned them he might be dangerous on the 28th, he did not warn them that he would continue to be dangerous even after receiving his medication. There is no evidence that either Lewis or Krueger had actual knowledge that Rowe would be dangerous on August 30th after receiving his medication again. Therefore, Rowe's claims of deliberate indifference against Lewis or Krueger fail as a matter of law and are dismissed.

## B) Defendants Gunderson and Arndt

Rowe has failed to state a claim of deliberate indifference against Gunderson, who issued his conduct report for fighting, or Arndt, who placed him in administrative segregation after fighting. There is no allegation or evidence that either Gunderson or Arndt was subjectively aware of Rowe's missed medication or his mental health needs. Because neither of them were aware of Rowe's mental health situation, neither of them could be deliberately indifferent to it. Therefore, Rowe's claims against Gunderson and Arndt are dismissed.

## C) Defendant Nickel

Rowe's claim against Nickel similarly fails. Nickel reviewed the conduct report and referred it to a disciplinary hearing for a major event. Because Rowe did not mention the missed dosage or his mental health needs to Gunderson, who wrote the conduct report, there is no mention of them in the report. Therefore, Nickel could not be deliberately indifferent in her review of the conduct report because she had no subjective knowledge of Rowe's mental health when reviewing the conduct report.

Additionally, Nickel was not deliberately indifferent to Rowe's mental health needs while in segregation. Nickel reviewed Rowe's disciplinary segregation on September 10, 2014, after Rowe had been given a sentence of 30 days segregation. Nickel had no subjective knowledge of a risk of harm to Rowe's mental health while in segregation. Rather Nickel's knowledge came from her review Dr. Landers' note that Rowe demonstrated adequate psychological adjustment while in segregation. As a non-medical professional Nickel was justified in relying on Dr. Landers' assessment. *See Hayes v. Snyder*, 546 F.3d 516, 526 (7th Cir. 2008) (explaining that if a prisoner is under the care of medical experts then a non-medical prisoner is justified in believing that the prisoner is in capable hands). Because Nickel had no subjective knowledge of a risk to Rowe's mental health at any point Rowe's claims against Nickel fail and must be dismissed.

**D) Defendant Mariani**

Rowe's claim against Mariani, who performed Rowe's disciplinary hearing and sentenced him to 30 days of disciplinary segregation, also fails. At the disciplinary hearing, Rowe confessed to fighting with the other inmate. Although Rowe stated that he was having "issues" with his medication, he did not explain or elaborate on what those issues were or why they would be relevant. In fact, there is no indication that Rowe ever explained that the missed medication was for his mental health, as opposed to medicine to treat a physical ailment. Mariani did not have any subjective knowledge of Rowe's underlying mental illness and Rowe did not tell him during the disciplinary hearing; therefore, Mariani could not be deliberately indifferent to those needs.

**E) Doctors Landers and Wean**

Rowe's claims that Dr. Landers and Dr. Wean were deliberately indifferent to his mental health needs while he was in segregation fail as a matter of law. Rowe does not allege that he was

deprived of mental health services while in segregation.[5]   Rather, Rowe alleges that Drs. Landers and Wean were deliberately indifferent simply by allowing him to remain in segregation.  Rowe also alleges that Dr. Landers was deliberately indifferent because she declared that it in her professional medical opinion, it was not appropriate for Rowe to use the missed medication as a justification for starting a fight a few days later.   However, these allegations are simply Rowe's disagreement with the medical treatment he received and his continued placement in segregation.  Disagreement with a medical professional's course of treatment, alone, is insufficient to state a claim of deliberate indifference against either doctor.  *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Furthermore, neither Dr. Landers nor Dr. Wean identified any risk to Rowe while in segregation. Rowe has not even identified a risk that he faced while in segregation.  Without a risk of harm, there is nothing for the doctors to be indifferent to and Rowe's claims fail as a matter of law.

**F) Defendants Galligan and Schneiter**

Rowe's claims against Galligan and Schneiter also fail as a matter of law.  Rowe alleges that they were deliberately indifferent to his medical or mental health needs by allowing him to stay in disciplinary segregation.  Galligan and Schneiter's only involvement with Rowe was when they reviewed his disciplinary segregation and recommended to release him.  In doing so, both reviewed Dr. Landers' assessment that Rowe demonstrated adequate psychological adjustment to his segregation and was not experiencing harm from being in segregation.  As non-medical professionals,

---

[5] The court notes that to the extent that Rowe sought to bring a claim for depriving him of mental health services while in segregation, that claim would also fail.  Rowe received his medication while in segregation and was seen three times by two doctors over his seventeen day stay. Furthermore, Rowe never requested psychological help or services while in segregation.  His only PSU request was filed on August 28th when he missed his medication.  Rowe has simply failed to identify any deprivation of mental health services that he needed and was deprived of while in segregation.

both were entitled to rely on her assessment. *See Hayes*, 546 F.3d at 526 (explaining that if a prisoner is under the care of medical experts then a non-medical prisoner is justified in believing that the prisoner is in capable hands). There is no allegation or evidence that Galligan or Schneiter had any subjective knowledge of a risk to Rowe's mental health while he was in segregation—especially considering Dr. Lander's assessment that he was adequately adjusting. Because of this, Rowe's allegations against Galligan and Schneiter fail as a matter of law.

## G) Defendant Heilsberg

Rowe's allegation that Heilsberg was deliberately indifferent also fails. Rowe alleges Heilsberg was deliberately indifferent because she responded to his psychological services request, where he claimed he could feel his anger rising, and did not give the request to PSU to schedule an appointment. However, Heilsberg received the request from PSU.[6] Therefore, Heilsberg was not deliberately indifferent in failing to give the request to PSU, because she received it from them.

## H) Defendants Patton, DeRosa, Facktor, O'Donnell, and Dittman

Rowe's claims against Patton, DeRosa, Facktor, O'Donnell, and Dittman all fail as a matter of law. Rowe alleges that these defendants were deliberately indifferent to his mental health needs because they failed to investigate his inmate complaint and the denial of his medication. However, Rowe cannot bring a claim of deliberate indifference against an officer reviewing an inmate's grievances when they have not somehow caused or participated in the violation of rights. *See George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) (explaining that only "persons who cause or participate in the violations [of constitutional rights] are responsible); *Burks v. Raemisch*, 555 F.3d

---

[6] PSU transferred the request to Heilsberg because it requested a medication refill, which PSU does not do. Heilsberg's only responsibility was to confirm that Rowe received his medication refill, which she did.

592, 595 (7th Cir. 2009) ("Dismissal [of an inmate complaint] no more manifests 'deliberate indifference' to the underlying problem than does a judge's decision dismissing a § 1983 suit"). Furthermore, this was an inmate grievance, not the appeal of his disciplinary hearing. A "[p]rison officials' mishandling or failure to respond to individual grievances does not implicate any constitutional right. . . . The Constitution requires no procedure at all, and the failure of state prison official to follow their own procedures (or to establish effective grievance procedures) does not, of itself, violate the Constitution." *Miller v. Rauner*, No. 17-cv-859-NJR, 2017 WL 4284568, at * 11 (S.D. Ill. Sept. 27, 2017) (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Maust v. Headley*, 959 F.2d 644, 648 (7th Cir. 1992); and *Shango v. Jurich*, 681 F.2d 1091, 1100–01 (7th Cir. 1982)). Therefore, Rowe's claims against Patton, DeRosa, Facktor, O'Donnell, and Dittman fail as a matter of law.

### I) Defendants Neal, Kumber, and Bett

Lastly, Rowe has failed to state a claim against Neal, Kumber, and Bett for his security placement in maximum security facility. Rowe does not have a liberty interest in being placed within a lower-security facility. As the Supreme Court has explained: "The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree to confinement in one prison may be quite different from that in another. The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons." *Meachum v. Fano*, 417 U.S. 215, 225–29 (1976); *Whitford v. Boglino*, 63 F.3d 527, 532 (7th Cir. 1995) (applying *Meachum* and finding no implication of liberty interest in the transfer of an inmate to the maximum security institution). Rowe has identified no liberty interest that he was deprived of during his security placement and without an established liberty interest, there can be no

due process violation. Therefore, Rowe's claims that Neal, Kumber, and Bett improperly placed, or affirmed his placement, in a maximum security prison fail as a matter of law.

## J) Qualified Immunity

Even if defendants had violated Rowe's constitutional rights, they have qualified immunity against liability. "[G]overnment officials performing discretionary function, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional right of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982). The "plaintiff . . . bears the burden of demonstrating the existence of the allegedly "clearly established" constitutional right." *Alvarado v. Picur*, 859 F.2d 448, 452 (7th Cir. 1988). The "right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on different grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)).

Rowe failed to respond to Defendants' qualified immunity argument. Furthermore, he has not established a case demonstrating a clearly established constitutional right that defendants have violated. Rowe cites to a handful of cases, but are all factually distinguishable. *See Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (finding deliberate indifference in a malicious denial of available medication); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (finding deliberate indifference in the failure to give prescribed pain medication when the prisoner was vomiting blood); *Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001) (finding deliberate indifference when the prison lost the inmate's heart medication during a transfer and the inmate was without medication

for over a week); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (finding deliberate indifference when the prison doctor's failure to provide treatment as ordered by a specialist). However, none of these cases involve an inmate who has failed to refill his prescription and then runs out. Therefore, they are insufficient to defeat qualified immunity for the defendants. Rowe has failed to demonstrate a clearly established constitutional right that defendants have violated and they are also entitled to qualified immunity.

## IV. CONCLUSION

For the reasons stated above, the court finds that Rowe's claims fail as a matter of law and even if they did not, defendants would be entitled to qualified immunity. Accordingly, the defendants' motion for summary judgment (ECF No. 45) is **GRANTED** and the case is **DISMISSED**. The Clerk is directed to enter judgment forthwith.

Dated this   22nd   day of January, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court